District Court
District of Connecticut
FILED AT NEW HAVEN

August 2 ____,20 24

By ____ S. Santos
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT          :          **Filed Under Seal**

                             :          ss: New Haven, Connecticut
                                         3:24-mj-688 (MEG)
COUNTY OF NEW HAVEN          :          August 2, 2024

**AFFIDAVIT IN SUPPORT OF APPLICATIONS
FOR SEARCH AND SEIZURE WARRANTS**

I, JOHN M. MONTONI, being duly sworn, deposes and says:

**I.  Introduction and Agent Background**

**A.  Affiant**

1.        I am a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and New York City Police Department ("NYPD") Joint Firearms Task Force.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed by the NYPD for fourteen years and have served as a Detective for nearly seven years. I have been a Task Force Officer with ATF for approximately nine months.  In the course of my work for the NYPD and ATF, I have participated in multiple investigations of firearms offenses, carjackings, gang activity, and crimes of violence, including fatal and non-fatal shootings. During the course of those investigations I have, among other things, conducted or participated in physical surveillance, electronic surveillance, the execution of search and tracking warrants, debriefings of informants, and the retrieval and analysis of cellphone and social media data.  Through my training, education, and experience, I have become familiar with the manner in which violent crimes are planned and executed and have become familiar with the manner in which individuals engaged in violent crime use cellphones in connection with such activity.  I also have experience reviewing

electronic records as part of my work on those matters, including electronically stored information ("ESI") extracted from cellphones and social media accounts.

2.      I have personally participated in the investigation of the offense discussed below. I am familiar with the facts and circumstances of this investigation from my own personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel.

3.      I make this Affidavit in support of applications pursuant to Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the following:

a.      The premises located on the second floor of a four-story, brick, residential building (the "Building") located at 14 Central Avenue, Apartment 4D, Waterbury Connecticut, 06702 (the "Subject Premises"), as described in Attachment A-1, for the items and information described in Attachment B-1.  A photograph of the Building containing the Subject Premises is shown below:



   b.  The cellular telephone bearing call number (475) 326-0511 that belongs to Luis Rodriguez Sosa (the "Subject Device"), as described in Attachment A-2, for the items and information described in Attachment B-2. Based on my review of subscriber records, I know that the subscriber associated with the Subject Device is "Luis Rodriguez Sosa."

   4.  This affidavit is based upon my personal knowledge; my review of documents and other evidence; and my conversations with other law enforcement personnel. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The Subject Offenses

   5.  For the reasons detailed below, I submit that there is probable cause to believe that the Subject Premises may contain evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 2119 (carjacking); 371 (conspiracy to commit carjacking); 922(o)(1) (possession of a machinegun); 924(c) (use of a firearm in connection with a crime of violence); and 2 (aiding and abetting the aforementioned crimes) (the "Subject Offenses").

## II. Probable Cause

### A. Probable Cause Regarding Commission of the Subject Offenses

   6.  On or about June 17, 2024, the Hon. James L. Cott of the Southern District of New York signed a corrected complaint (the "Complaint") charging JOSE RIVERA and JOMAR CRESPO (the "defendants") with all of the Subject Offenses save for conspiracy, in violation of 18 U.S.C. § 371. *See* Case No. 24 MAG 2287 (S.D.N.Y.). On July 1, 2024, a Grand Jury returned an indictment charging the defendants with the Subject Offenses. *See* 24 Cr. 412 (GHW) (S.D.N.Y.).

7.     The Complaint is attached hereto as Attachment C. I base this affidavit on the allegations contained in the Complaint, which are incorporated by reference as if set forth fully herein, as well as on my conversations with other law enforcement officers, my review of additional law enforcement records and surveillance footage, and my training and experience.

8.     On or about June 14, 2024, in the Southern District of New York, JOSE RIVERA and JOMAR CRESPO stole a BMW 330xi (the "Car") from a victim ("the Victim") after brandishing firearms at the Victim.  (Complaint ¶ 1).

9.     Based on my review of surveillance footage, I know that just before carjacking the Victim, an apparent Chevy Malibu (the "Malibu") carrying RIVERA, CRESPO, and at least two other individuals (the "Co-Conspirators") stopped a short distance from the Victim's Car, at which point RIVERA and CRESPO exited the Malibu and proceeded to rob the Victim.

10.     On or about June 15, 2024, I interviewed the Victim, who is currently employed as a Sergeant with the NYPD, and the Victim reported the following, in substance and in part:

a.  On June 14, 2024, between approximately 11:20 and 11:30 pm, the Victim was sitting inside his personal Car, which is a white BMW 330xi that the Victim had purchased from a dealership in New Jersey.  The Car was parked in the vicinity of West 146th Street and Bradhurst Avenue in New York, New York (Complaint ¶ 5(a)).

b.  Two men—later identified as RIVERA and CRESPO—approached the Victim's Car from behind, one on the driver's side, and the other on the passenger's side.  Both RIVERA and CRESPO wore black clothing and facemasks, and both brandished handguns at the Victim. Upon reaching the Car's front windows, the defendants knocked on the windows and ordered the Victim to get out of the Car.  The Victim complied.  (Complaint ¶ 5(b)).

4

c. After the Victim got out of the Car, the defendant on the driver's side of the Car ordered the Victim to put the Car keys in the Car. When the Victim did not immediately comply, the defendant on the passenger side of the Car walked around to the driver's side, so both RIVERA and CRESPO were standing with the Victim. Although it was dark outside, there was a streetlight nearby, and the Victim was able to see that both RIVERA and CRESPO were brandishing semiautomatic handguns, which were black, large, and shaped in a way that caused the Victim to initially believe they might be tasers.[1] The Victim then tossed the Car keys into the Car and fled. RIVERA and CRESPO got into the Car and drove away. (Complaint ¶ 5(c)).

d. The Victim called 911, then went inside his apartment to find a document that reminded him of the Car's license plate number. When the Victim came back downstairs, police arrived and used the "Find My iPhone" application to try locating the Victim's iPhone, which he had left in the Car. Although the iPhone appeared to have been powered off, an iPad in the backseat of the Car began providing location, and police and the Victim tracked it until they found the Car in the vicinity of West 138th Street and Broadway. (Complaint ¶ 5(d)).

11.     From my review of security camera footage obtained from delis at the corner of West 138th Street and Broadway ("Store-1") and West 137th Street and Broadway ("Store-2"), respectively, I have learned the following, among other things:

a.     After RIVERA and CRESPO, took the Victim's Car, they drove it to the vicinity of West 138th Street and Broadway, where they parked on the northwest corner and exited. (Complaint ¶ 6(a)).

---

[1] As discussed below, the firearms RIVERA and CRESPO pointed at the Victim were equipped with, among other things, flashlights mounted underneath the barrels, which would cause the fronts of the firearms to look larger and differently shaped than standard pistols.



b.      RIVERA and CRESPO then walked to Store-1 on the southwest corner, where they can be seen wearing all black, with RIVERA holding what appears to be a mask, and CRESPO apparently putting something in his pocket.  Their physical appearances on the video also appear consistent with the appearances of RIVERA and CRESPO as captured in arrest photographs provided below. (Complaint ¶ 5(b)).

 

 

**JOSE RIVERA**          **JOMAR CRESPO**



    c.    As seen below, surveillance footage with audio recording from the exterior and interior of Store-1 make clear that RIVERA appeared to be holding a cellphone just before entering Store-1 and while inside of it.

8



d.      While inside Store-1, RIVERA displayed his cellphone to an employee of Store-1 ("Employee-1") and stated something, prompting Employee-1 to state that he did not have a phone.

e.      RIVERA and CRESPO then walked south off of the view of the camera at Store-1.  Thereafter, RIVERA and CRESPO entered Store-2, which is located one block south at West 137th Street and Broadway.  (Complaint ¶ 6(c)).

12.     Based on my review of Store-2 surveillance footage with audio recording, as well as law enforcement records, I know that while inside Store-2, RIVERA temporarily handed over his own cellphone in exchange for a cellphone belonging to an employee of Store-2 ("Employee-2").  With Employee-2's cellphone, RIVERA placed a call to the Subject Device and conducted a brief, urgent conversation that was largely in Spanish.[2]  During the conversation RIVERA asked, in sum and substance, "where are you guys," requesting that the user of the Subject Device retrieve

---

[2] While I do not speak or understand Spanish, I have reviewed the above-described conversation with the assistance of a law enforcement officer who is fluent in the Spanish language.

him and repeatedly attempting to communicate the address of Store-2. After inquiring and receiving confirmation that the address of Store-2 was in New York, the user of the Subject Device stated that he would arrive in twenty minutes.

13.    Based on my review of cellphone subscriber records for the Subject Device, I know that the subscriber associated with the Subject Device is "Luis Rodriguez Sosa." Accordingly, I believe that the user of the Subject Device is Luis Rodriguez Sosa ("Sosa"). As explained more fully below, I believe that Sosa is one of the Co-Conspirators described above, *supra* ¶ 9.

14.    Based on open-source information, I know that the "475" area code, which is the area code assigned to the Sosa Phone, covers Waterbury, Connecticut. As described more fully below, I believe that Sosa resides at the Subject Premises located in Waterbury Connecticut.

15.    Shortly after placing the phone call to the user of the Subject Device, RIVERA exited Store-2 followed by CRESPO, and their faces were captured on footage from Store-2's security system, provided below. Again, their appearances are consistent with RIVERA's and CRESPO's arrest photographs. (Complaint ¶ 6(c)).

 

16.     After leaving Store-2, RIVERA and CRESPO walked back up to the adjacent corner—which was the southwest corner of West 137th Street and Broadway—and turned left from Broadway onto West 137th Street.  Moments later, a marked NYPD SUV drove west on West 137th Street in the direction RIVERA and CRESPO just turned.  After a few seconds, RIVERA and CRESPO came back to Broadway and begin sprinting south, away from the direction of the NYPD vehicle. (Complaint ¶ 6(d)).

 

11



17.     From my conversations with officers involved in the initial response to the Victim's call, the apprehensions of RIVERA and CRESPO, and the identification and collection of evidence—as well as from my review of arrest paperwork, property invoices, body camera footage, and surveillance footage—I have learned the following, among other things:

a.     Law enforcement officers recovered the Victim's Car in the vicinity of West 138th Street and Broadway.  Inside the Car, officers located rubber gloves, which I know from training and experience may be worn to prevent the wearer from leaving fingerprints, DNA, or other biological or forensic material at a crime scene or on objects touched during the commission of a crime.  The Victim said, in substance and part, that the gloves were not his. (Complaint ¶ 7(a)).

b.     As RIVERA and CRESPO fled on foot, officers pursued them westbound on 135th Street.  RIVERA, a few paces ahead of CRESPO, tossed a firearm ("Firearm-1") into a small fenced-in area in front of the vicinity of 617 West 135th Street, which a pursuing officer ("Officer-1") safeguarded until it was recovered.  A few seconds later, CRESPO, veering into the street itself, tossed a firearm ("Firearm-2") beneath a parked car.  Immediately after tossing

Firearm-2, CRESPO was apprehended, at which time Firearm-2 was safeguarded and recovered.[3] (Complaint ¶ 7(b)). RIVERA was apprehended beneath a parked car in the area of 134th Street and Riverside Avenue.

        c.     Upon arrest, RIVERA and CRESPO were found to be wearing clothing that matched the videos excerpted above, which are generally consistent with the Victim's description of their attire. (Complaint ¶ 7(c)).

        d.     Upon inspection, Firearm-1 was determined to be a loaded Glock 27 .40-caliber pistol equipped with what appears to be a Glock automatic switch device (the "Glock Switch"), which was subsequently determined to be operable, meaning that it would cause Firearm-1 to automatically shoot more than one shot by a single function of trigger. Firearm-2 was determined to be a loaded Glock 17 9-millimeter pistol with an extended magazine that could hold up to approximately 30 rounds of ammunition. Both Firearm-1 and Firearm-2 had flashlights mounted beneath their barrels. Photographs of Firearm-1 and Firearm-2 appear below. (Complaint ¶ 7(d)).

---

[3] An earlier version of the Complaint described CRESPO discarding Firearm-1 into a small fenced-in area in front of the vicinity of 617 West 135th Street. That description was based on an earlier conversation with one of the officers (Officer-1) pursuing RIVERA and CRESPO. At the time of our conversation, Officer-1 had not observed the pertinent surveillance footage. Furthermore, Officer-1 was not involved in the arrest or identification of the defendants. Rather, upon seeing Firearm-1 be discarded, Officer-1 stopped his foot pursuit and safeguarded Firearm-1.

**Firearm-1**                                    **Firearm-2**




e.     Following their arrests, RIVERA and CRESPO were placed in separate
interview rooms and advised of their *Miranda* rights. CRESPO voluntarily agreed to waive those
rights, and he admitted that (i) he (CRESPO) and a friend had traveled to New York from
Connecticut; (ii) he (CRESPO) and his friend saw a white BMW and decided to steal it, after which
they approached the owner and told the owner to give up the vehicle; and (iii) he (CRESPO)
possessed a firearm with a red band—identified in a photograph as Firearm-1—which he threw as
he was running from police.[4] (Complaint ¶ 7(e)).

18.     Based on my review of Connecticut law enforcement records, specifically an
automobile accident report, I know that on or about February 22, 2023, CRESPO and an individual
identified as "Luis Rodriguez-Sosa" were together inside of an automobile involved in an accident.
Accordingly, I believe that Sosa has known CRESPO for at least over a year.

19.     On or about June 25, 2024, the Hon. Robyn F. Tarnofsky of the Southern District
of New York signed a warrant for historical and prospective cell site information for the Subject

---

[4] The interview of CRESPO was conducted entirely in Spanish, after which the interviewer
summarized some of its contents including the admissions described herein.

Device (the "June 25 Warrant").  *See* Case No. 24 MAG 2398 (S.D.N.Y.).  From my review of

historical cell-site analysis based on information obtained from the June 25 Warrant, I understand

that the Subject Device connected to a cell site in the vicinity of Waterbury, Connecticut between

approximately 8:17 and 8:23 p.m., on the evening of June 14, 2024.  Beginning around 11:30,

p.m., the Subject Device connected to a cell site in  the vicinity of 146th Street and Bradhurst

Avenue, in New York, New York, *i.e.*, the location of the carjacking described in the Complaint.[5]

      20.   On or about June 19, 2024, I spoke to a victim ("Victim-2") of an attempted

carjacking (the "Attempted Carjacking").  From that conversation, as well as my review of law

enforcement records, I have learned the following:

      a.   On or about the evening of June 14, 2024, in the southeast corner of a

parking lot in the vicinity of Bradhurst Avenue and 155th street (the "Parking Lot"), Victim-2 was

attending to something in the trunk of his parked vehicle when Victim-2 was approached by a male

dressed in black who faced Victim-2 and pointed a firearm at him.  Victim-2 observed that the

firearm had something red near the trigger of the firearm, which is consistent with the appearance

of Firearm-1. Moments later, Victim-2 felt something pressed against his back.  Upon turning

---

[5] From my review of historical cell-site information obtained from the June 25 Warrant, as well as my conversations with other law enforcement officers, I believe that as of approximately June 26, 2024, the Subject Device may be associated with a new electronic device.  Specifically, based on the foregoing, I have learned that on or about June 26, 2024, the IMEI (*i.e.*, the numeric identifier that identifies an electronic device on a mobile network) associated with the Subject Device changed to reflect an Apple iPhone 13 different from the Apple iPhone 13 associated with the Subject Device from on or about June 1, 2024 through on or about June 25, 2024. It is possible—if not foregoing—that at least some data transferred between the two Apple iPhone 13s associated with the Subject Device.  In other words, communications and other evidence of the Subject Offenses stored on the Subject Device prior to June 26, 2024 may well be found on the Subject Device after the SIM card associated with the Subject Device was transferred or "ported" to the second Apple iPhone 13.

around, Victim-2 observed another male brandishing a firearm at him. The males addressed Victim-2 in Spanish[6] demanding, among other things Victim-2's car keys.

   b.   The males brandishing firearms stole a Samsung A32 Galaxy phone, a wallet contained credit cards belonging to Victim-2, and a necklace chain belonging to Victim-2. Before Victim-2 could remove his car keys from a carabiner attached to his person, the males fled into a white sedan matching the Chevy Malibu, which had pulled into the Parking Lot.

   c.   Immediately after his encounter with the two males brandishing firearms, Victim-2 called 911 from a phone belonging to another individual, owing to the fact that Victim-2 had been robbed of his personal phone.

   d.   Following the arrest of RIVERA and CRESPO, Victim-2 identified them as the two males who had brandished firearms at him in the Parking Lot that evening.

   21.   Based on my review of review of surveillance footage, I know that the Attempted Carjacking occurred approximately five to ten minutes before—and approximately about eight blocks away from—the carjacking described in the Complaint.

   22.   Based on my review of surveillance footage, snapshots of which are depicted below, I know that on or about June 14, 2024, at approximately 11:50 p.m., the Malibu entered a gas station at or near 131st Street and Broadway in New York, New York (the "Gas Station"). At the Gas Station, one of the Co-Conspirators, wearing rubber gloves matching those found in the Car of the Victim, *supra* ¶ 17(a), as well as a black hooded sweatshirt with a white Nike logo, black Adidas track pants with three stripes continuing from the waist to the thigh, purple and

---

[6] Based on the fact that Victim-2 was able to relate the substance of the robbers' demands, I believe that Victim-2 speaks and understands Spanish.

black sneakers, and an orange face covering, exited the driver's seat of the Malibu and attempted

to use the credit card belonging to Victim-2.









23.     I submit that there is probable cause to believe that Sosa is one of the Co-Conspirators based on the fact that, shortly after committing the carjacking described in the Complaint, RIVERA contacted the user of the Subject Device from Store-2, asking "where are you guys?" and requesting for the user of the Subject Device to pick him up immediately, *supra* ¶ 12-13; the Subject Device connected to a cell site in the vicinity of the carjacking at the time the carjacking occurred, having traveled from Connecticut, which is where CRESPO admitted to traveling from "with a friend," *supra* ¶¶ 17(e), 19; and my comparison of images of the individual depicted at the Gas Station, *i.e.*, the individual who exited the Malibu and attempted to use the stolen credit card of Victim-2, with the following photograph of Sosa from Waterbury Connecticut law enforcement records:



24.     For the following reasons, I believe that Sosa resides at the Subject Premises:

a.      On or about July 19, 2024, at approximately 12:45 p.m., I personally observed the individual depicted above, *i.e.*, Luis Rodriguez Sosa, exit the Building containing the Subject Premises.

b.      Based on my review of law enforcement databases, as well as subscriber records for the Subject Device, I know that the Subject Premises is the listed residence for Sosa. The subscriber records provided by the service provider for the Subject Device specifically lists Apartment 4D as Sosa's residence.

25.     Based on my training, experience, and participation in this investigation, as described above, there is probable cause to believe that the Subject Premises may contain the following evidence, fruits, and/or instrumentalities of the Subject Offenses:

a.      Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys;

b.     Evidence concerning the identity, location, or physical appearance of—and communications with—co-conspirators;

c.     The Subject Device and any Apple iPhone capable of storing pictures and other electronic media depicting individuals involved in the Subject Offenses or capable of transmitting communications among co-conspirators;

d.     Purple disposable gloves or evidence of the same;

e.     Black disposable gloves or evidence of the same;

f.     A black hooded sweatshirt with a white Nike logo;

g.     Black Adidas track pants with three stripes continuing from the waist to the thigh or evidence of the same;

h.     Purple and black sneakers or evidence of the same;

i.     An orange face covering or evidence of the same;

j.     A black balaclava-style face covering or evidence of the same;

k.     Black and grey Louis Vuitton shoulder bag;

l.     Property stolen from Victim-2 on the evening of June 14, 2024, including but not limited to a Samsung Galaxy A32, credit cards in the name of Victim-2, identification cards in the name of Victim-2, or evidence of the same;

m.     Firearms, ammunition, and evidence of firearm possession by members of the above-described conspiracy.

**B.  Probable Cause to Search Electronic Devices**

26.    The requested warrants seek authorization to seize the Subject Device and other Apple iPhones found at the Subject Premises and to search the Subject Device.

21

27.     Based on my experience, training, and familiarity with cellular telephones like the Subject Device, I am aware of the following:

a.     Cellular telephones frequently have telephone directory features, as well as methods to learn the call number associated with each cellular telephone, such as caller-identification features.  Cellular telephones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names.  Cellular telephone users often maintain lists, such as address books or contact information, that are stored on the cellular telephone or its SIM or memory card.

b.     Cellular telephones typically have voicemail or voice-mailbox features that allow callers to leave voice and/or alphanumeric messages if the cellular telephone user does not answer.  Voicemail is typically stored on the computer network of the provider of the cellular telephone's telephone service, which network is external to the cellular telephone, but may also be stored on the cellular telephone itself.

c.     Cellular telephones typically have messaging capabilities, including text, data, chat, digital photographs and video, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service) messaging and email (collectively, "text messages"), that permit the cellular telephone user to send and receive text messages, including messages with digital photographs and video attached.  Text messages and any attachments are typically stored on the computer network of the provider of the cellular telephone's telephone service, which network is external to the cellular telephone, but may also be stored on the cellular telephone itself.

d.     Cellular telephones often have electronic calendar features that allow the cellphone user to schedule appointments and meetings.  Cellular telephone users often use that feature to remind themselves of meetings and appointments with friends and confederates.

22

e.    In addition to voicemail and text-messaging features, some cellular telephones offer capabilities such as sending and receiving email, and accessing and downloading information from the Internet.

f.    Cellular telephones may have applications installed, including social media and messaging applications that permit the user to communicate with contacts using these applications.

g.    Cellular telephones with camera functions permit the cellular telephone user to take photographs and videos, which are stored on the cellular telephone itself.

h.    Cellular telephones may record location data that records where the user has carried or used the cellular telephone.

i.    The information described above usually remains accessible in the cellular telephone's memory even if the cellular telephone has lost all battery power and has not been used for an extended period of time.

28.    Based on my training and experience, I know that individuals who conspire to commit crimes—co-conspirators who travel to commit those crimes—typically communicate about their criminal exploits by cellphone.  Such communications among co-conspirators may include, among other things, text messages and phone calls to arrange travel to and from the location of the planned crime; text messages and phone calls regarding criminal objectives; and text messages and phone calls among co-conspirators to facilitate the evasion of law enforcement following the crime.  As described above, there is probable cause to believe that RIVERA, CRESPO, Sosa, and other Co-Conspirators drove from Connecticut to New York to commit the carjacking described in the Complaint in the Malibu.  Furthermore, as described above, while

inside Store-2, RIVERA borrowed the cellphone of Employee-2 to place a call to Sosa, the user of the Subject Device, possibly to coordinate flight from the scene.

29.     Based on my training and experience and my familiarity with investigating carjackings, I know that individuals involved in such crimes often use cellular telephones to discuss, plan, and conceal carjackings and to arrange the for the sale or disposition of stolen cars and other robbery proceeds. Such individuals use cellphones because, among other reasons, the identity of a cellphone subscriber may be concealed, cellphone numbers are easily changed, and cellphones may be used to send communications using encrypted messaging services and social media applications over the Internet.  I have also learned that individuals involved in crimes of violence and property crimes, like carjackings, often store information relating to their illegal activity—and to persons involved with them in that activity—on electronic devices like cellphones.  Such information includes, for example, logs of online "chats" with co-conspirators; text and email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; photos of cars and other stolen items.  Individuals engaged in carjackings often store such records in order to, among other things,  (i) keep track of co-conspirators' contact information; (ii) keep track of contact information for potential buyers of stolen goods; (iii) market to, and communicate with, potential buyers over the Internet; (iv) keep a record of illegal transactions for future reference; and (v) keep an accounting of robbery proceeds for purposes of, among other things, dividing those proceeds with co-conspirators.

30.     Based on my training and experience, I know that firearms are typical tools of carjackings and often are purchased through clandestine, online channels.  This is especially true of firearms that are equipped with extended magazines and Glock automatic switch devices like

the Glock Switch recovered by law enforcement here. In the instant case, as explained above and in Exhibit A, RIVERA and CRESPO brandished Firearm-1 and Firearm-2, respectively, to rob the Victim of the Car. They also brandished firearms in a failed effort to carjack Victim-2.

31.    Records relating to the purchase of firearms in connection with carjacking can include, for example, text, email, and audio communications with co-conspirators, including telephone numbers, e-mail addresses; and identifiers for instant messaging and social media accounts.

32.    Based on my training and experience, I also know that co-conspirators use electronic devices to film their preparation for and commission of their criminal exploits. In this instance, based on my review of a cellphone belonging to RIVERA (the "Rivera Phone"),[7] I know that the Rivera Phone contained a series of videos, dated June 12, 2024, in which an individual dressed in black and wearing black disposable gloves showcases Firearm-1—identifiable by the red "Supreme" wrapping around the handle. In one of the videos, Firearm-1 appears to be outfitted with a Glock switch and extended magazine. The video, snapshots of which are included below, also displays a cellphone resting on the thigh of the individual handling Firearm-1, as well as a black and grey Louis Vuitton monogram bag with gold hardware on the shoulder strap.

---

[7] On or about June 21, 2024, the Hon. James L. Cott in the Southern District of New York signed a warrant authorizing the search of the Rivera Phone. *See* Case No. 24 MAG 2365 (S.D.N.Y.).



In another video, captured below, the individual showcasing Firearm-1 wears a black balaclava-style face covering, black disposable gloves, and a black sweatshirt with a white Nike logo, matching the sweatshirt worn by one of the Co-Conspirators believed to be Sosa, *supra* ¶ 22.



33.     In addition to probable cause to believe that the Subject Device contains evidence of the Subject Offenses, there is also probable cause to believe that the Subject Device is an instrumentality of the Subject Offense.  According to surveillance footage, RIVERA called the

Subject Device shortly after the carjacking the Victim, perhaps in an attempt to facilitate the defendants' flight.

34.     Based on my training and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been created or saved on electronic devices such as cellphones. Even when such files have been deleted, they can often be recovered, depending on how an electronic device has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve information from an electronic device depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and habits.

## III.  Procedures for Searching ESI

### A.  Biometric Unlock

35.     In my training and experience, it is likely that the Subject Device uses biometric unlocking features, such as facial recognition unlocking.

36.     The warrant proposed herein would permit law enforcement, with the use of the device's biometric features, to compel Sosa to unlock the Subject Device.

37.     I seek this authority based on the following:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  In order to activate this unlocking mechanism, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive or has not been unlocked for a

certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

    f.  The passcode or password that would unlock a given device recovered during execution of the requested warrants likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the search authorized by the requested warrants, it will likely be necessary to press the finger(s) of the user of the fingerprint reader, or hold the device in front of the face of the user, of any device capable of biometric unlocking. The government may not otherwise be able to access the data contained on the Target Devices for the purpose of executing the search authorized by these warrants.

  38.  Due to the foregoing, if the Subject Device or any electronic device whose seizure is authorized by the requested warrants may be unlocked using one of the aforementioned biometric features, the warrants I am applying for would permit law enforcement personnel to:

    a.  Press or swipe the fingers (including thumbs) of Sosa against the fingerprint scanner of the devices;

    b.  Hold the device up to the face of Sosa to activate any facial recognition features and/or its iris recognition features.

  39.  Law enforcement officers will select which fingers to press to the devices. The warrant does not authorize law enforcement to compel that Sosa state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the

warrants do not authorize law enforcement to compel Sosa to identify the specific biometric characteristics (including unique fingerprint(s) or other physical features) that may be used to unlock or access the Subject Device.

**B.   Review of ESI**

40.    Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Device and other electronic devices whose seizure is authorized by the warrants for information responsive to the warrants.

41.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

42.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrants.  Depending on the

circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the devices to locate all data responsive to the warrants.

### C. Return of Electronic Devices

43.     If the Government determines that any electronic device is no longer necessary to retrieve and preserve the data on the device, and that device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the device, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## IV.  Conclusion and Ancillary Provisions

44.     The offenses described in this affidavit occurred in June 2024. As noted above, I believe that Sosa has known CRESPO since February 2023, *see supra* ¶ 18, and evidence that Sosa and CRESPO knew each other is relevant to establishing the conspiracy alleged in this affidavit. Accordingly, the requested warrants seek the seizure of information for the time period from February 2023 to the present.

45.     Based on the foregoing, I believe there is probable cause that evidence, fruits, and instrumentalities of the Subject Offenses are located at the Subject Premises.  Therefore, I respectfully request that this Court issue a search warrant for the Subject Premises, as described in Attachment A-1, authorizing the search and seizure of the items described in Attachment B-1.

46.     Based on the foregoing, I further believe there is probable cause the Subject Device constitutes—and contains information that constitutes—evidence, fruits, and instrumentalities of the Subject Offenses. Therefore, I respectfully request that this Court issue a search warrant

for the Subject Device, as described in Attachment A-2, authorizing the search and seizure of the items described in Attachment B-2.

47.    With respect to the warrant for the Subject Device, law enforcement plans to execute this warrant by approaching Sosa in public or knocking on the door to his residence in Waterbury, Connecticut and upon confronting Sosa with the warrant, seizing the Subject Device from Sosa.  In the event that Sosa refuses to hand the Subject Device to law enforcement when presented with the warrant, I respectfully request that law enforcement be permitted to search Sosa's person to locate and seize the Subject Device.   Law enforcement will further determine that the device seized is the Subject Device by calling telephone number (475) 326-0511 (the phone number for the Subject Device, as noted above) and confirming that the device rings or otherwise indicates an incoming call.

JOHN MONTONI (Affiliate)  Digitally signed by JOHN MONTONI (Affiliate)
Date: 2024.08.02 12:39:36 -04'00'

John M. Montoni
Detective
ATF-NYPD Joint Firearms Task Force

The truth of the foregoing affidavit has been attested to me by John M. Montoni over the telephone on this 2nd day of August, 2024, at New Haven, Connecticut, in accordance with the requirements of Fed. R. Crim. P. 4.1.

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**Premises to be Searched**

The premises located on the second floor of a four-story, brick, residential building located at 14 Central Avenue, Apartment 4D, Waterbury Connecticut, 06702 (referred to herein and Attachment B-1 as the "Subject Premises"). A photograph of the building containing the Subject Premises is below:



**ATTACHMENT B-1**

**Items to Be Seized**

## I. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises are the following evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 2119 (carjacking); 371 (conspiracy to commit carjacking); 922(o)(1) (possession of a machinegun); 924(c) (use of a firearm in connection with a crime of violence); and 2 (aiding and abetting the aforementioned crimes) (the "Subject Offenses") for the time period from February 1, 2023 to the present:

    a.    Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys;

    b.    Evidence concerning the identity, location, or physical appearance of—and any communications with—co-conspirators;

    c.    The cellphone associated with telephone number (475) 326-0511 and any Apple iPhone capable of storing pictures and other electronic media depicting individuals involved in the Subject Offenses or capable of transmitting communications among co-conspirators;

    d.    Purple disposable gloves or evidence of the same;

    e.    Black disposable gloves or evidence of the same;

    f.    A black hooded sweatshirt with a white Nike logo;

    g.    Black Adidas track pants with three stripes continuing from the waist to the thigh or evidence of the same;

    h.    Purple and black sneakers or evidence of the same;

    i.    An orange face covering or evidence of the same;

    j.    A black balaclava-style face covering or evidence of the same;

    k.    Black and grey Louis Vuitton monogram shoulder bag;

    l.    Property stolen from the victim of an attempted carjacking on the evening of June 14, 2024, including but not limited to a Samsung Galaxy A32, credit cards in the name of the victim, identification cards in the name of the victim, or evidence of the same;

      m.     Firearms, ammunition, and evidence of firearm possession by members of the above-described conspiracy.

With respect to the seizure of electronic devices, as authorized in I.c above, this warrant only allows the seizure of those devices, but not the search of those devices.

**ATTACHMENT A-2**

**Property to be Searched**

The device that is the subject of this search and seizure warrant (referred to herein and in Attachment B-2 as the "Subject Device") is particularly described as the cellular telephone belonging to **LUIS RODRIGUEZ SOSA** and bearing call number (475) 326-0511.

The Subject Device is presently located in the District of Connecticut.

This warrant authorizes the search of **LUIS RODRIGUEZ SOSA's** person and his personal effects in the immediate vicinity and control of **LUIS RODRIGUEZ SOSA** at the location where the search warrant is executed, including any backpacks, briefcases, and bags.

During the execution of the warrant, law enforcement personnel are authorized to obtain from **LUIS RODRIGUEZ SOSA** the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of **LUIS RODRIGUEZ SOSA** to the fingerprint scanner of the device; (2) hold the device in front of the face of **LUIS RODRIGUEZ SOSA** to activate the facial recognition feature; and/or (3) hold the device in front of the face of **LUIS RODRIGUEZ SOSA** to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant. Law enforcement may not use force to hold **LUIS RODRIGUEZ SOSA's** eyes open to use the biometric functions.

## ATTACHMENT B-2

### Items to be Seized

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the electronically stored information ("ESI") contained on the Subject Device for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2119 (carjacking); 371 (conspiracy to commit carjacking); 922(o)(1) (possession of a machinegun); 924(c) (use of a firearm in connection with a crime of violence); and 2 (aiding and abetting the aforementioned crimes) (the "Subject Offenses"). (the "Subject Offenses") described as follows for the time period from February 1, 2023 to the present:

1.     Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Device, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, photographs, videos, and browsing history.

2.     Evidence concerning the identity or location of co-conspirators involved in the Subject Offenses, vehicles involved in the Subject Offenses, and individuals involved in planning, executing, and/or concealing carjackings in or before June 2024;

3.     Communications of any kind relating to the Subject Offenses, including but not limited to text, data, chat, MMS (*i.e.*, multimedia messaging service), and SMS (*i.e.*, short message service), email messages, or messages on social media or messaging applications installed on the Subject Device (collectively, "text messages"), any attachments to those text messages, such as digital photographs and videos, and any associated information, such as the phone number or user ID from which the text message was sent;

4.     Evidence concerning the location of carjacking proceeds, firearms, and ammunition, including Internet searches and browsing history related to the Subject Offenses;

5.     Evidence, including documents, spreadsheets, and ledgers, identifying and/or tracking co-conspirators or carjacking proceeds;

6.     Evidence, including documents, spreadsheets, and ledgers, regarding the purchase or sale of firearms and ammunitions, as well as accounts used to receive, transfer, or launder funds used in connection with the purchase or sale of firearms and ammunition;

7.     Evidence, including communications of any kind and documents, regarding attempts to acquire, sell, or dispose of cars, firearms, or ammunition;

8.     Evidence of incoming and outgoing calls and opened and unopened voicemail messages relating to the Subject Offenses;

9.       Calendar or other scheduling information relating to the Subject Offenses (including but not limited to travel itineraries and meetings with co-conspirators);

10.      Historical location data, including GPS data, showing the Subject Device's user(s)'s movements relating to the Subject Offenses (including but not limited to travel and meeting locations related planned carjackings and the acquisition of firearms);

11.      Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses;

12.      Digital photographs and videos relating to the Subject Offenses; and

13.      Evidence concerning any online accounts or any electronic devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

**ATTACHMENT C**

Copy of Complaint, Case No. 24 MAG 2287 (S.D.N.Y.)

AUSA: FRANK BALSAMELLO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

24 MAG 2287

UNITED STATES OF AMERICA

**CORRECTED COMPLAINT**

v.

Violations of 18 U.S.C. §§ 2119, 924(c), and 922(o)

JOSE RIVERA and
JOMAR CRESPO,

COUNTY OF OFFENSE:
NEW YORK

Defendants.

SOUTHERN DISTRICT OF NEW YORK, ss.:

JOHN MONTONI, being duly sworn, deposes and says that he is a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and New York City Police Department ("NYPD") Joint Firearms Task Force, and charges as follows:

## COUNT ONE
### (Carjacking)

1.      On or about June 14, 2024, in the Southern District of New York and elsewhere, JOSE RIVERA and JOMAR CRESPO, the defendants, with the intent to cause death and serious bodily harm, took a motor vehicle that had been transported, shipped, and received in interstate and foreign commerce from the person and presence of another by force and violence and by intimidation, to wit, RIVERA and CRESPO brandished and pointed guns at another person (the "Victim") and stole the Victim's BMW 330xi (the "Car").

(Title 18, United States Code, Sections 2119 and 2.)

## COUNT TWO
### (Firearms Use, Carrying, and Possession)

2.      On or about June 14, 2024, in the Southern District of New York and elsewhere, JOSE RIVERA and JOMAR CRESPO, the defendants, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, namely, the carjacking charged in Count One of this Complaint, knowingly used and carried firearms, and in furtherance of such crime, possessed firearms, and aided and abetted the use, carrying, and possession of firearms, which were brandished, including a machinegun that was capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and (ii),
924(c)(1)(B)(ii), and 2.)

## COUNT THREE
### (Possession of a Machinegun)

3.      On or about June 14, 2024, in the Southern District of New York and elsewhere, JOSE RIVERA and JOMAR CRESPO, the defendants, knowingly possessed a machinegun, in violation of Title 18, United States Code, Section 922(o)(1), and aided and abetted the same, to wit, RIVERA and CRESPO possessed and aided and abetted the possession of a Glock .40-caliber pistol equipped with a part designed and intended solely and exclusively, and a combination of parts designed and intended, for use in converting the weapon into a machinegun.

(Title 18, United States Code, Sections 922(o)(1) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.      I have been employed by the NYPD for approximately fourteen years and served as a Detective for approximately seven years.  For approximately the last nine months, I have been assigned as a TFO to the ATF/NYPD Joint Firearms Task Force.  Together with other members of law enforcement, including detectives, task force officers, and special agents, I have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in this investigation, my conversations with other law enforcement officers and other individuals, as well as my examination of reports and other records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported in this Complaint, they are reported in substance and in part, except where otherwise indicated.

5.      On or about June 15, 2024, I interviewed the Victim, who is currently employed as a Sergeant with the NYPD, and the Victim reported the following, in substance and in part:

a.      On June 14, 2024, at approximately 11:20 pm, the Victim was sitting inside his personal Car, which is a white BMW 330xi that the Victim had purchased from a dealership in New Jersey.  The Car was parked in the vicinity of West 146th Street and Bradhurst Avenue in New York, New York.

b.      Two men—later identified as JOSE RIVERA and JOMAR CRESPO, the defendants, as explained below—approached the Victim's Car from behind, one on the driver's side, and the other on the passenger's side.  Both RIVERA and CRESPO wore black clothing and facemasks, and both brandished handguns at the Victim.  Upon reaching the Car's front windows, the defendants knocked on the windows and ordered the Victim to get out of the Car.  The Victim complied.

c.      After the Victim got out of the Car, the defendant on the driver's side of the Car ordered the Victim to put the Car keys in the Car.  When the Victim did not immediately comply, the defendant on the passenger side of the Car walked around to the driver's side, so both RIVERA and CRESPO were standing with the Victim.  Although it was dark outside, there was a streetlight nearby, and the Victim was able to see that both RIVERA and CRESPO were brandishing semiautomatic handguns, which were black, large, and shaped in a way that caused

the Victim to initially believe they might be tasers.[1] The Victim then tossed the Car keys into the Car and fled. RIVERA and CRESPO got into the Car and drove away.

      d.      The Victim called 911, then went inside his apartment to find a document that reminded him of the Car's license plate number. When the Victim came back downstairs, police arrived and used the "Find My iPhone" application to try locating the Victim's iPhone, which he had left in the Car. Although the iPhone appeared to have been powered off, an iPad in the backseat of the Car began providing location, and police and the Victim tracked it until they found the Car in the vicinity of West 138th Street and Broadway.

      6.      From my review of security camera footage obtained from delis at the corner of West 138th Street and Broadway ("Store-1") and West 137th Street and Broadway ("Store-2"), respectively, I have learned the following, among other things:

      a.      After JOSE RIVERA and JOMAR CRESPO, the defendants, took the Victim's Car, they drove it to the vicinity of West 138th Street and Broadway, where they parked on the northwest corner and exited.



      b.      They then walked to Store-1 on the southwest corner, where they can be seen wearing all black, with RIVERA holding what appears to be a mask, and CRESPO apparently putting something in his pocket. Their physical appearances on the video also appear consistent with the appearances of RIVERA and CRESPO as captured in arrest photographs provided below.

---

[1] As discussed below, the firearms RIVERA and CRESPO pointed at the Victim were equipped with, among other things, flashlights mounted underneath the barrels, which would cause the fronts of the firearms to look larger and differently shaped than standard pistols.






**JOSE RIVERA**                **JOMAR CRESPO**

 

      c.     After RIVERA and CRESPO walked south off of the camera at Store-1, they entered Store-2, which is located one block south at West 137th Street and Broadway. Shortly thereafter, they exited Store-2, and their faces were captured on footage from Store-2's security system, provided below. Again, their appearances are consistent with RIVERA's and CRESPO's arrest photographs.

 

      d.     After leaving Store-2, RIVERA and CRESPO walked back up to the adjacent corner—which was the southwest corner of West 137th Street and Broadway—and turned

left from Broadway onto West 137th Street. Moments later, a marked NYPD SUV drove west on West 137th Street in the direction RIVERA and CRESPO just turned. After a few seconds, RIVERA and CRESPO came back to Broadway and begin sprinting south, away from the direction of the NYPD vehicle.

 



7.      From my conversations with officers involved in the initial response to the Victim's call, the apprehensions of JOSE RIVERA and JOMAR CRESPO, the defendants, and the identification and collection of evidence—as well as from my review of arrest paperwork, property

6

invoices, body camera footage, and surveillance footage—I have learned the following, among other things:

   a. Inside the Car, officers located rubber gloves, which I know from training and experience may be worn to prevent the wearer from leaving fingerprints, DNA, or other biological or forensic material at a crime scene or on objects touched during the commission of a crime. The Victim said, in substance and part, that the gloves were not his.

   b. As RIVERA and CRESPO fled on foot, officers pursued them westbound on 135th Street. RIVERA, a few paces ahead of CRESPO, tossed a firearm ("Firearm-1") into a into a small fenced-in area in front of the vicinity of 617 West 135th Street, which a pursuing officer ("Officer-1") safeguarded until it was recovered. A few seconds later, CRESPO, veering into the street itself, tossed a firearm ("Firearm-2") beneath a parked car. Immediately after tossing Firearm-2, CRESPO was apprehended, at which time Firearm-2 was safeguarded and recovered.[2]

   c. Upon arrest, RIVERA and CRESPO were found to be wearing clothing that matched the videos excerpted above, which are generally consistent with the Victim's description of their attire.

   d. Upon inspection, Firearm-1 was determined to be a loaded Glock 27 .40-caliber pistol equipped with what appears to be a Glock automatic switch device (the "Glock Switch"), which, if operable, would cause Firearm-1 to automatically shoot more than one shot by a single function of trigger.[3] Firearm-2 was determined to be a loaded Glock 17 9-millimeter pistol with an extended magazine that could hold up to approximately 30 rounds of ammunition. Both Firearm-1 and Firearm-2 had flashlights mounted beneath their barrels. Photographs of Firearm-1 and Firearm-2 appear below.

---

[2] An earlier version of this Complaint described JOMAR CRESPO, the defendant, discarding Firearm-1 into a small fenced-in area in front of the vicinity of 617 West 135th Street. That description was based on an earlier conversation with one of the officers ("Officer-1") pursuing JOSE RIVERA and JOMAR CRESPO, the defendants. At the time of our conversation, Officer-1 had not observed the pertinent surveillance footage. Furthermore, Officer-1 was not involved in the arrest or identification of the defendants. Rather, upon seeing Firearm-1 be discarded, Officer-1 stopped his foot pursuit and safeguarded Firearm-1.

[3] The NYPD is in the process of testing the Glock Switch to confirm that it functions as designed. If it does, then I know from training, education, and experience that the Glock Switch alone meets the statutory definition of a "machinegun," as it is a "part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b).

**Firearm-1**                         **Firearm-2**

 

        e.      Following their arrests, RIVERA and CRESPO were placed in separate interview rooms and advised of their *Miranda* rights. CRESPO voluntarily agreed to waive those rights, and he admitted that (i) he (CRESPO) and a friend had traveled to New York from Connecticut; (ii) he (CRESPO) and his friend saw a white BMW and decided to steal it, after which they approached the owner and told the owner to give up the vehicle; and (iii) he (CRESPO) possessed a firearm with a red band—identified in a photograph as Firearm-1—which he threw as he was running from police.[4]

---

[4] The interview of CRESPO was conducted entirely in Spanish, after which the interviewer summarized some of its contents including the admissions described herein.

8

WHEREFORE, I respectfully request that JOSE RIVERA and JOMAR CRESPO, the defendants, be imprisoned or bailed, as the case may be.

JOHN MONTONI
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 17th day of June, 2024.

THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

9